# Exhibit A

JAN 1 5 2013

U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| FRANCINE FRIEDMAN GRIESING, On Behalf of Herself and Others Similarly Situated, Plaintiff, v. GREENBERG TRAURIG, LLP Defendant. | AMENDED CLASS ACTION COMPLAINT JURY TRIAL DEMANDED Civ. No 12-cv-8734 (WHP) |

Plaintiff Francine Friedman Griesing ("Ms. Griesing," "Plaintiff," "Named Plaintiff" or "Class Representative"), by her attorneys Sanford Heisler, LLP, brings this action in her individual capacity and on behalf of a class of current and former female shareholders (collectively "female Shareholders" or "the Class"), against Greenberg Traurig, LLP ("GT," "the Firm" or "Defendant") to redress gender discrimination in employment. Plaintiff Griesing alleges upon knowledge as to herself and her own acts, and otherwise upon information and belief, as follows:

## I. INTRODUCTION

### A. THE FEDERAL EQUAL EMPLOYMENT OPPORTUNITY COMMISSION FINDS GT ENGAGED IN CLASSWIDE GENDER DISCRIMINATION.

1. In a June 28, 2012 determination, the federal Equal Employment Opportunity Commission ("EEOC") found "reasonable cause to believe" that GT discriminated against its

women attorneys in violation of Title VII and the Equal Pay Act by compensating women—including Plaintiff Griesing—less than similarly situated male counterparts and treating Ms. Griesing and class members less favorably than similarly situated male shareholders.

2.    Such a finding is extremely rare. For example, in 2011, the EEOC found reasonable cause in only 3.8% of *all* investigations, including both individual and class charges.[1]

3.    Moreover, the EEOC also found that GT retaliated against Ms. Griesing because she raised concerns about GT's discrimination.

## B.    GT'S DISCRIMINATION IS PARTICULARLY SEVERE, EVEN IN THE CONTEXT OF AN INDUSTRY-WIDE PROBLEM OF GENDER DISCRIMINATION AGAINST FEMALE ATTORNEYS.

4.    The "glass ceiling" remains firmly in place at large law firms. A recent American Bar Association study found that at law firms nationwide, female attorneys comprise 45 percent of law firm associates, but only 15 percent of equity partners.[2] (At GT, the title "shareholder" is the equivalent to the title "partner" at other law firms.)

5.    A 2012 survey by a national law firm consulting organization found that, on average, law firms compensated male partners $237,000 more per year than female partners, meaning women earn at least $7,000,000 less than their male counterparts over the course of their careers.[3]

6.    In yet another survey, a majority of female partners reported being denied their fair share of client origination credit, and a shocking thirty percent reported they were subjected to intimidation, threats or bullying after disputing the allocation of origination credits.[4]

---

[1] "All Statutes, FY 1997-2011," U.S. Equal Employment Opportunity Commission (available at http://www.eeoc.gov/eeoc/statistics/enforcement/all.cfm).
[2] "A Current Glance at Women in the Law 2012," *Commission on Women in the Profession, American Bar Association*, Jan. 2012 (available at www.abanet.org/women).
[3] "2012 Partner Compensation Survey," Major, Lindsey & Africa (available at www.mlaglobal.com).
[4] "New Millennium, Same Glass Ceiling? The Impact of Law Firm Compensation Systems on Women," The Project for Attorney Retention and Minority Corporate Counsel Association (available at www. attorneyretention.org).

7.     Yet even in a field dominated by archaic gender stereotypes, GT stands out for its culture of discrimination against female attorneys. While the Firm advertises a commitment to equal opportunity for female attorneys, the reality is far different.

8.     The Firm ranked 193 out of 221 top law firms in the number of female equity partners, according to the National Law Journal "Women in the Equity Partnership: How Firms Fare." Indeed, women represent only 9.62% of GT's equity shareholders, well below the national average of 15% for AMLaw 200 and National Law Journal 250 firms.[5]

9.     GT's Philadelphia office, where Plaintiff Griesing worked, exemplifies the Firm's broad-based and engrained sexism. As the EEOC recognized, male shareholders in GT's Philadelphia office receive (a) more compensation than similarly situated female shareholders; (b) greater business-generating opportunities and internal referrals from other male shareholders; and (c) higher titles than similarly situated female shareholders. GT, in short, pays women less, promotes them at lower rates than men and virtually freezes them out from high-level managerial positions.

10.     GT's gender disparities are neither coincidental nor limited to its Philadelphia office. One man, CEO Richard Rosenbaum ("CEO Rosenbaum"), makes all promotion and compensation decisions for *each and every* GT shareholder nationwide. CEO Rosenbaum consults with only four other high-ranking male GT shareholders on shareholder compensation: the Executive Chairman, the President, the Chairman of the Board and a Regional Operating Shareholder. Together, these five men make up GT's Compensation Committee, a centralized brotherhood controlling who gets paid what at all times.

---

[5] "Women in the Equity Partnership: How Firms Fare," *National Law Journal* (July 23, 2012) (available at http://arwebserver.arlaw.com/pdf/ALM_Women_In_Partnership_Survey2012.pdf).

11. Greenberg Traurig has never had a female CEO, and, upon information and belief, has never had a female member of the Compensation Committee.

12. In addition, members of the Compensation Committee openly express animus towards female shareholders. For example, CEO Rosenbaum told Ms. Griesing that female shareholders in the Philadelphia office were "worthless," and that they are allowed to stay at the Firm only because Regional Operating Shareholder Michael Lehr ("Mr. Lehr" or "Regional Operating Shareholder Lehr") "liked to keep them around." Mr. Lehr, who ran several offices (including Philadelphia) and served on the Compensation Committee, told female attorneys that only "tall, male and Jewish" GT lawyers generate business.

13. At the same time, Mr. Lehr has admitted that there is "no formula" for compensation and that it is entirely subjective, commenting that female shareholders are "lucky" to get paid as much as they do. CEO Rosenbaum has echoed this admission, characterizing GT's compensation decisions as "somewhat of an art form."

14. GT conceals its arbitrary and discriminatory decision-making by using a "closed" compensation system where decisions are made in a black box in order to shield from review, critique or appeal both its methodology (if any) and final decisions.

\* \* \*

15. This action arises out of GT's systematic, Firm-wide discriminatory treatment of its female shareholders on the basis of their gender. GT discriminates against female shareholders through, *inter alia*: (a) its discriminatory policies, practices and procedures with respect to the selection and advancement of female shareholders; and (b) its discriminatory policies, practices and procedures with respect to the compensation of female attorneys, all in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of

1991 and the Lilly Ledbetter Fair Pay Act of 2009 ("Fair Pay Act"), 42 U.S.C. §§ 2000e, *et. seq.* ("Title VII"); and the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"). GT also discriminated and retaliated against Ms. Griesing, including terminating her employment, in violation of Title VII.

16.    Class Representative Griesing seeks, on behalf of herself and the Class she seeks to represent, declaratory and injunctive relief; back pay; front pay; compensatory damages; nominal, liquidated and punitive damages; and attorneys' fees, costs and expenses to redress GT's pervasive and discriminatory employment policies, practices and/or procedures. Ms. Griesing also brings individual claims based on GT's retaliation against her.

## II.    PARTIES

17.    Plaintiff Francine Friedman Griesing is and was a resident and citizen of Philadelphia County in the State of Pennsylvania at all relevant times herein. Ms. Griesing was employed at GT as a 300-level shareholder from April 2007 to January 2010. At all relevant times herein Ms. Griesing was a female "employee" as defined by Title VII and the EPA.

18.    Defendant GT is a limited liability partnership with offices worldwide, including in New York, New York; Philadelphia, Pennsylvania; and Miami, Florida. GT's New York office is the Firm's largest, with more than 300 attorneys and governmental professionals who perform approximately 22% of all of GT's work worldwide. The New York office represents all the Firm's major practices and areas of industry experience, including corporate transactional work, financial restructuring and bankruptcy, litigation, real estate, intellectual property and governmental affairs. GT's New York office is also the home office of former Firm President and current Firm CEO Richard Rosenbaum. At all times relevant herein, GT is and was an "employer" as defined by Title VII and the EPA.

### III.   JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 because this action is based on Title VII, the EPA and the Declaratory Judgment Act, which are federal statutes. This Court has personal jurisdiction over Defendant under N.Y. CLS CPLR § 302(a)(1) because Defendant transacts significant business in the State of New York.

20.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because Defendant transacts a substantial portion of its business in the State of New York, maintains its largest office in the Southern District of New York and Richard Rosenbaum governs the Firm from New York.  From New York, CEO Rosenbaum sent Ms. Griesing her employment offer letter, made decisions regarding Ms. Griesing's compensation, conducted Ms. Griesing's annual reviews, was responsible for investigating Ms. Griesing's compensation discrimination complaints and ultimately terminated her employment.

21.    Additionally, a substantial part of the events or omissions giving rise to the claims set forth herein, including the discriminatory denial of pay and wrongful termination, occurred in the Southern District of New York.

22.    Ms. Griesing has perfected her administrative rights by timely filing her EEOC charge, waiting over three years for a determination and requesting her Right to Sue.  She received her Right to Sue on January 11, 2013.

IV.    **FACTUAL ALLEGATIONS**

A.    **BACKGROUND**

23.    Ms. Griesing is a graduate of Binghamton University, *magna cum laude*, and of the University of Pennsylvania Law School, also *cum laude*.

24.    Ms. Griesing has more than thirty years of experience representing clients in business counseling, complex litigation, alternate dispute resolution and government affairs. She has been lead counsel in many multi-million dollar matters. Ms. Griesing has also received numerous accolades and awards from national and community organizations for her professional accomplishments and civic leadership.

25.    Ms. Griesing performed exceptionally well at GT. She generated millions of dollars for the Firm, and the Firm never criticized the quality of her work. To the contrary, Michael Lehr, Regional Operating Shareholder and head of the Philadelphia office, told Ms. Griesing that she "over-performed" and that she "hit the ball out of the park" in her originations.

B.    **GT ASSIGNS FEMALE SHAREHOLDERS TO LOWER LEVELS THAN SIMILIARLY QUALIFIED MALE SHAREHOLDERS.**

26.    At GT, there are three distinct shareholder levels: 300 level, 500 level and 1,000 level. Upon information and belief, GT typically assigns incoming shareholders to the 300 or 500 level, and requires shareholders to spend at least three years at the 500 level before being eligible for consideration for the 1,000 level.

27.    Shareholder level affects compensation; access to development and growth opportunities; access to resources and clients; and leadership opportunities.

28.    The 1,000-shareholder position is the Firm's most highly compensated shareholder position with, upon information and belief, 1,000-level shareholders on average earning roughly $1 million more per year than other shareholders. Less than 10% of the 1,000-

level shareholders are women.

29.   These 1,000-level shareholders attend exclusive Firm retreats where they network; refer business to one another; and cultivate closer relationships with clients in order to generate more business. As explained below, increased business generation boosts shareholder compensation by increasing origination and timekeeper revenues.

30.   As noted above, attaining a 500-level position is a prerequisite for consideration for a promotion to the 1,000 level. In addition, 500-level shareholders are able to hold practice group and administrative leadership roles within the Firm, which they are told can increase compensation. Finally, upon information and belief, 500-level shareholders are eligible in some years to attend the exclusive retreats with 1,000-level shareholders and clients. 300-level shareholders are not.

31.   GT routinely assigns female shareholders to lower levels while assigning similarly or lesser-qualified males to higher levels.

32.   For example, when the Firm hired Ms. Griesing, it assigned her to the 300 level— the lowest possible—while the Firm assigned similarly or less qualified males to the 500 level. In fact, when Ms. Griesing joined GT, all but one of the female shareholders in the Pennsylvania office were assigned to the 300 level, even though many had more experience and better qualifications than several of the male shareholders assigned to the 500 level. Upon information and belief, the only female shareholder in the Philadelphia office at the 500 level at that time was involved in a long-term, intimate relationship with a highly placed, senior male shareholder.

33.   By assigning women to lower levels and delaying their promotion, the Firm denies its female shareholders compensation and opportunities to which they are otherwise entitled.

34.     GT management has admitted that it has no objective criteria for determining shareholder level. For example, when Ms. Griesing asked about the criteria for advancement to the 500 level at her 2008 annual review, GT's Regional Operating Shareholder explained that there were no written criteria and that shareholder level was based on his perception of whether shareholders were "qualified."

35.     To the extent that there is a GT "system" for assigning or promoting shareholders into the various levels, that system lacks sufficient standards, quality controls, implementation metrics, transparency and oversight.

36.     Accordingly, GT senior management can and does exploit the system to offer opportunities to male shareholders who are often less qualified than their female counterparts. Even male shareholders who (a) are irresponsible, often absent and perform poorly due to various personal problems or (b) have substantially less professional, leadership or business development experience and lower financial contributions are assigned by GT into higher levels or are promoted over female shareholders like Ms. Griesing with exemplary records, significantly more experience and superior contributions.

37.     To justify these discriminatory decisions, GT makes excuses such as claiming female shareholders need to be at the Firm longer before their contributions could be assessed adequately (despite having no tenure requirements for male shareholders) or claiming that the level of shareholder does not really matter to one's career.

## C.     GT PAYS FEMALE SHAREHOLDERS LESS THAN MALE SHAREHOLDERS.

38.     Defendant GT compensates female shareholders less than their similarly situated male peers, and often less than less-qualified and lower-performing male peers.

39. GT's compensation system for shareholders lacks sufficient standards, quality controls, implementation metrics, transparency and oversight.

40. According to the offer letters the Firm provides to lateral hire shareholders and the compensation information provided to all shareholders, higher origination and timekeeper revenues translate into higher compensation.

41. However, although GT promises that shareholder compensation is based on a formula that takes into account originations and timekeeper revenues, the Firm denies female shareholders opportunities to increase their originations and timekeeper revenues. Meanwhile, Rosenbaum has sole discretion to decide shareholder compensation in a process that lacks objective, measurable or reliable metrics or standards.

42. At all points, discrimination taints the analysis. As discussed above, the assignment to shareholder level is driven by discrimination. Moreover, a general animus towards women, fueled by gendered assumptions and stereotypes, permeates the decision-making process. In addition, both originations and timekeeper revenues are compromised by GT's discriminatory culture and broken policies. The result is that female shareholders are subjected to systemic disparate treatment and disparate impact.

     *i.*     ***GT relies on gendered assumptions and stereotypes regarding gender and compensation.***

43. The Firm commonly and openly makes compensation decisions based on archaic assumptions that men were responsible for financially supporting a family.

44. GT senior leadership has explicitly justified compensation decisions with comments that male shareholders "needed it more" or that male shareholders had "families to support."

45.    In contrast, at retreats the Firm hosts for its lawyers, male management frequently make comments that female shareholders do not do as well as men because of their mothering and parenting duties.

46.    The Firm routinely pays female shareholders less than even those male counterparts who committed legal and ethical violations.

### ii.    GT's measurement of originations is tainted by discrimination.

47.    Origination revenue is intended to measure the amount of revenue collected by the Firm from clients or matters that a shareholder generates or participates in generating.

48.    GT's policy allows shareholders to share origination credit with one another. Male shareholders establish a "boys club" in which they share origination credit with one another to boost their origination revenues, at the expense of Ms. Griesing and other female shareholders.

49.    The Firm also permits shareholders to claim duplicative credit for the same originations.    This process has a disparate impact on female shareholders, because male shareholders can and do (a) claim partial credit for originations that rightfully belong to female shareholders and (b) work to coordinate duplicative claiming amongst themselves while simultaneously excluding female shareholders.

50.    In addition, male shareholders often decline to work on matters brought to the firm by female shareholders unless the female shareholders agree that the male shareholder may claim a part of the origination credit—even though the men play no role in the origination.

51.    Excluded from the boys club of origination sharing and duplicative claiming, Ms. Griesing and other female shareholders had fewer opportunities to generate and claim origination credits and thus had lower compensation than their male counterparts.

52. GT's policies also affect which shareholders attend client "pitches," meetings that often lead to new client originations and higher timekeeper revenues. Firm policy allows shareholders to choose what other shareholders participate in pitches, but the policy is insufficiently designed, articulated, explained or implemented. As a result, male shareholders routinely invite male shareholders to client pitches and exclude female shareholders. For example, Ms. Griesing was invited to participate in only one client pitch during her tenure at GT, and that invitation came from a female shareholder.

53. Even when female shareholders are included in successful client pitches, they nonetheless are often denied the origination credit.

54. Female shareholders discuss amongst themselves the discriminatory effect of GT's origination policies. For example, numerous female shareholders in the Philadelphia office complained to Ms. Griesing that their originations, and thus their compensation, were lower due to gender discrimination.

55. Similarly, at a nationwide shareholder meeting in September 2008, roughly a dozen of the Firm's most highly accomplished female shareholders performed a song about male shareholders cheating them out of originations and decreasing their total compensation. Nonetheless, GT's senior management did nothing and continues to do nothing to reform or otherwise improve its discriminatory policies and practices.

### iii. GT's measurement of timekeeper revenue is tainted by discrimination.

56. An individual's timekeeper revenue is intended to measure the amount of revenue collected by the Firm as a result of work performed by that individual shareholder.

57. GT's policies and practices ensure that male shareholders will have higher timekeeper revenues than female shareholders.

58.     The Firm allows and encourages male shareholders to utilize their "boys club" in selecting which shareholders should receive internal referrals. For example, in 2009, Ms. Griesing received only one substantial matter through an internal referral (and only after a male shareholder declined that referral), while her male colleagues obtained the majority of their cases from internal referrals.

59.     GT's policies and practices regarding client pitches not only suppress female shareholders' origination revenues but also their timekeeper revenues. Because women are excluded from pitches, female shareholders must spend more of their time than the men working to develop new business.

60.     In addition, the Firm itself routinely directs work to male shareholders at the expense of female shareholders. For example, when GT hired Ms. Griesing, Mr. Lehr promised her that the Firm had plenty of work to keep her busy. Despite this, GT did not assign her to work on cases that fell clearly within her expertise and instead assigned the work to male shareholders who lacked her experience. Ms. Griesing's timekeeper revenues suffered as a result.

61.     This system of work referral and assignment lacks sufficient standards, quality controls, implementation metrics, transparency and oversight. It results in female shareholders like Ms. Griesing having to dedicate significant non-billable hours to researching, identifying, and cultivating new business—all while equally or lesser-qualified male shareholders have billable work handed to them by the Firm's male shareholders and by the Firm itself.

62.     Moreover, the Firm disproportionally allocates resources to male shareholders at the expense of female shareholders. Male shareholders are allowed to monopolize staff and associates, and even to reassign staff and associates away from cases run by female shareholders.

13

As a result, female shareholders must do both their own work and staff-level support work. This diverts the female shareholders' time from client billable work that would increase their timekeeper revenues.

63.     At all points, GT has created a system that supports increased male shareholder timekeeper revenues and hamstrings female shareholder timekeeper revenues. Again, this is an openly acknowledged problem. In Ms. Griesing's own experiences, many of the female shareholders in the Philadelphia office frequently discussed how their timekeeper revenues, and thus their compensation, were lowered by GT's gender discrimination.

### D.     GT REFUSES TO IMPLEMENT ITS EXISTING COMPENSATION POLICIES FAIRLY OR CONSISTENTLY EVEN WITH RESPECT TO EXEMPLARY PERFORMANCE BY A FEMALE SHAREHOLDER.

64.     During her tenure at GT from April 2007 to January 2010, Ms. Griesing generated more than $4,000,000 in combined timekeeper revenues and originations. Despite her exemplary performance, the Firm underpaid her relative to her male peers.

65.     Ms. Griesing's March 2007 offer letter provided that if she generated $600,000 in originations, her bonus would be $108,000. GT further explained that her bonus would fluctuate based on her actual performance numbers. Thus, if her numbers were higher, the compensation would increase accordingly, just as it could decrease if her numbers were lower.

66.     Even though Ms. Griesing originated more than *twice* the benchmarked $600,000 amount, GT did not increase her 2008 bonus accordingly. Instead, GT paid her only $115,000 in total bonus—adding $7,000 to the bonus rather than the more than $100,000 in additional bonus that would have been the appropriate and proportional increase based on her actual origination numbers.

67.    GT also originally promised Ms. Griesing in her offer letter that it would provide a partial advance on her annual bonus in July 2008.  However, when it came time to pay that amount, GT refused.

68.    When Ms. Griesing complained about GT's refusal to pay timely the amount owed to her, Mr. Lehr admitted that GT owed her the partial advance.  However, Regional Operating Shareholder Lehr instructed Ms. Griesing "not make an issue out of it" because it was "unwise" to question CEO Rosenbaum about her compensation.  He further told her that if she "desperately needed the money" she should "borrow it" because that would be better than "challenging Richard [Rosenbaum]."

### E.    WOMEN IN INTIMATE RELATIONSHIPS WITH FIRM MANAGEMENT ARE PROTECTED FROM DISCRIMINATION.

69.    GT has one exception to its general practice of denying women professional development opportunities and compensating women less than men.  GT prioritizes, pays and promotes women who have intimate relationships with Firm leaders or who acquiesce to sexualized stereotypes.

70.    Male shareholders in positions of authority direct billable work and client development opportunities to female shareholders with whom they are intimately involved, and otherwise support and advocate for them.

71.    Upon information and belief, among the very few women in GT management and high shareholder levels, many have had intimate relationships with Firm leaders.  These relationships are apparent—tacitly or even explicitly acknowledged.

72.    Accordingly, GT sends female shareholders the unwelcome message that the only way women can shatter the glass ceiling at GT and otherwise circumvent the discrimination that otherwise runs rampant is by sexualizing their professional relationships at the Firm.

73.     Consistent with this message, Ms. Griesing and other female shareholders worked in an office environment in which male shareholders freely commented on the physical appearance of female shareholders. For example, one member of the Firm's Executive and Compensation Committees asked Ms. Griesing at a Firm social event if she was "the fifty-year-old Philadelphia shareholder who looked like she was thirty" and told her he would "take better care of her" if she moved to California where he had managerial responsibility.

## F.     GT RETALIATES AGAINST FEMALE SHAREHOLDERS WHO RAISE DISCRIMINATION COMPLAINTS.

74.     While GT "takes care of" (a) male shareholders and (b) female shareholders who are sexually available to senior leadership, it dismisses or retaliates against those female shareholders who dare to question or raise concerns about its discriminatory assignment and promotion practices.

75.     For example, after Ms. Griesing raised complaints of discrimination, GT retaliated against her by denying her equal access to client work and client origination opportunities; refusing to compensate her in a timely manner; denying her ability to participate in the planning and administration of the Philadelphia office litigation group; interfering with her ability to work with other shareholders on client and Firm matters; interfering with her relationships with her principal associate and administrative assistant; treating her differently than other shareholders in the annual review and compensation process; and threatening to sue her for defamation if she pursued her claims against the Firm.

76.     As discussed above, the various forms of discrimination at GT are open and evident. Yet GT does nothing to correct these problems. Instead, it expects its female shareholders to feel "lucky" or thankful for whatever they are given by CEO Rosenbaum and GT's senior leadership and to otherwise keep quiet.

77. GT not only discourages female shareholders from raising complaints of gender discrimination but also actively retaliates against female shareholders who do complain, sending a message to women that complaining about gender discrimination will doom their careers at GT.

78. Accordingly, the Firm has little in the way of reporting mechanisms to handle concerns or complaints about discrimination, and the little it has is woefully inadequate.

79. The main recourse offered by the Firm is what it calls a "respectful conversation." This policy suggests that shareholders with concerns should seek an opportunity to have a "respectful conversation" with CEO Rosenbaum about that concern. However, it is widely known and reinforced by GT senior management that challenging CEO Rosenbaum is unwise.

80. As a result, shareholders are left with the options of (a) making no complaint, (b) risking drawing the ire of CEO Rosenbaum, or (c) attempting to work through the Regional Operating Shareholders or other members of the Firm's senior leadership.

### 1. MS. GRIESING COMPLAINS REPEATEDLY.

81. Ms. Griesing first spoke about her experience of gender discrimination at GT with the Philadelphia Operating Shareholder and Office Litigation and Employment Group Chair, Robert Goldich, who is also an experienced employment lawyer. Goldich told her he was "sorry" but that he "did not control the pursestrings," and referred her to Michael Lehr.

82. Then, on January 8, 2009, Ms. Griesing raised concerns with her Regional Operating Shareholder, Michael Lehr, that the Firm undercompensated her based on (a) the terms of her offer letter, (b) the amount of her origination revenue and (c) her other contributions to the Firm, including filling in on cases after male shareholders underperformed.

83. Mr. Lehr admitted to Ms. Griesing that GT underpaid her by at least $200,000.

84.     However, Mr. Lehr further told Ms. Griesing that she did not "need the money." Mr. Lehr explained that the Firm had chosen to decrease Ms. Griesing's bonus so that the Firm could offer higher bonuses to male shareholders who had "families to support." Mr. Lehr also told her that male shareholders "needed the money more" than she did (disregarding the fact that these male shareholders were absent from work routinely and shirked their client responsibilities) and that she was "lucky to have a job." He also chastised her, characterizing her complaints about compensation as "unseemly."

85.     Ms. Griesing then complained to Hilarie Bass, Global Operating Shareholder and Head of GT's Women's Initiative. In that conversation, she explained her concerns about gender discrimination, including her conversation with Mr. Lehr. Ms. Bass commented that other women have raised these issues with her. However, Ms. Bass also stated that she was concerned that Mr. Lehr would retaliate against Ms. Griesing if she raised these issues herself with Firm management.

86.     Although Ms. Bass promised to speak with Firm management and address Ms. Griesing's concerns within ten days of their January 2009 conversation, Ms. Bass then ignored Ms. Griesing's emails and calls for more than two months. When Ms. Bass finally responded, she did not address Ms. Griesing's complaint and instead directed her to talk with Firm management.

87.     Ms. Bass also admitted that GT offers lower positions and less compensation to female lateral hires than to male lateral hires and that "it take[s] women several years to catch up."

88.     After GT's Assistant General Counsel Mary Bruno was informed about Ms. Griesing's situation, Ms. Bruno claimed to "investigate" Ms. Griesing's complaint. However,

upon information and belief, Ms. Bruno failed to conduct the relevant and appropriate interviews. In addition, Ms. Bruno refused to assess whether Ms. Griesing's claims were founded, commenting that it was "not [her] job to determine credibility." Ms. Bruno ultimately took no action in response to Ms. Griesing's complaints and told Ms. Griesing there was nothing she could do.

### 2. GT THREATENS MS. GRIESING.

89.  Rather than do anything to assist Ms. Griesing, Ms. Bruno later threatened her that if she pursued her claims by filing a Complaint with the EEOC, GT would sue Ms. Griesing for defamation.

### 3. MS. GRIESING MEETS WITH CEO ROSENBAUM.

90.  With no recourse being offered by any other avenue, Ms. Griesing had no choice but to go directly to CEO Rosenbaum. CEO Rosenbaum responded by telling her that he would not investigate her allegations unless she agreed to be "happy" at the Firm.

91.  Because Ms. Griesing refused to acquiesce to GT's discrimination, CEO Rosenbaum refused to take any action to remedy or otherwise address Ms. Griesing's complaint.

92.  Ms. Griesing had exhausted every avenue for assistance within the Firm and so had no choice but to file a Charge of discrimination with the federal Equal Employment Opportunity Office on September 21, 2009.

93.  After Ms. Griesing filed the EEOC Charge of Discrimination, the Firm hired Outside Counsel to investigate Ms. Griesing's claims but used that "investigation" to send a loud message to female shareholders that complaining about gender discrimination would ruin their GT careers.

94.     In December 2009, the Firm arranged for its Outside Counsel to interview certain female shareholders in the Philadelphia office about Ms. Griesing's EEOC Charge, scheduling the interviews *within an hour* of the female shareholders' performance evaluations so they would understand that the interviews were directly related to their performance evaluations.

95.     Further, upon information and belief, GT's Counsel concealed from the female shareholders that the EEOC Charge was filed on behalf of a class of which they were members. Instead, upon information and belief, GT's Counsel told the female shareholders that they did not need to consult with independent counsel because "nothing would come of" Ms. Griesing's claims.

96.     After Ms. Griesing provided information to the EEOC about these interviews, GT's Counsel threatened to file suit against her and her lawyer for defamation.

## G.     GT TERMINATED MS. GRIESING'S EMPLOYMENT.

97.     Ms. Griesing requested a meeting with CEO Rosenbaum in April 2009 to discuss her complaint of discrimination. After twice rescheduling the meeting, CEO Rosenbaum agreed to meet with her in June 2009 at a restaurant near GT's New York office.

98.     At the meeting, CEO Rosenbaum diminished and demeaned Ms. Griesing throughout. He called her a "disgruntled employee" and decreed that she "would be happier elsewhere."

99.     He took a break from berating Ms. Griesing to insist on ordering her meal for her, based on his "wife's favorite" order.

100.     CEO Rosenbaum told Ms. Griesing that if she was going to persist in questioning her compensation she "need[ed] to leave" GT. He said that the Firm may not be "the right place for [her]" and that "she did not have a future" at GT. CEO Rosenbaum also said he would not

look into her compensation to determine if she was underpaid unless she agreed to "recommit to the Firm" and "not tell anyone" if he paid her additional compensation.

101. CEO Rosenbaum also instructed Ms. Griesing to explore other employment opportunities.

102. The Firm stopped assigning her work altogether and assigned a number of cases to her male counterparts, even though Ms. Griesing was more qualified to handle the cases.

103. The Firm also urged her principal associate to work for another shareholder and told that associate and Ms. Griesing's administrative assistant that they were paid less because they worked for Ms. Griesing instead of male shareholders.

104. On December 21, 2009, while conducting Ms. Griesing's annual review, CEO Rosenbaum chastised Ms. Griesing for filing an EEOC Charge of Discrimination and hiring a lawyer for that process and then informed Ms. Griesing that he was finding it "difficult to treat [her] fairly" in light of her complaints of discrimination.

105. Ms. Griesing's last day as a GT shareholder was January 8, 2010.

**H.    THE EEOC FINDS IN FAVOR OF MS. GRIESING.**

106. The EEOC found "reasonable cause to believe" that GT retaliated against Ms. Griesing "after she complained about discrimination."

**I.    MS. GRIESING HAS SUFFERED DUE TO GT'S DISCRIMINATION AND RETALIATION.**

107. GT's discrimination caused Ms. Griesing to suffer significant emotional distress and substantially diminished her quality of life in myriad ways affecting her health and her family and personal relationships.

## V.    CLASS ALLEGATIONS

108.    Class Representative Griesing incorporates by reference allegations from previous paragraphs of the Complaint alleging class-based discrimination against female shareholders.

109.    Class Representative Griesing represents a class consisting of all female shareholders who are, have been or will be employed by GT from April 2007 to the date of judgment. She and the Class of GT shareholders she seeks to represent have been subjected to a systemic pattern and practice of gender discrimination and disparate impact gender discrimination by GT.

110.    Class Representative Griesing brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and (c)(4), seeking injunctive and monetary relief for the systemic pattern and practice of gender discrimination to which Defendant has subjected her and a class of female shareholders.

111.    Defendant GT tolerates and cultivates a work environment that discriminates against female shareholders. The Firm's management is disproportionately male dominated. Throughout the liability period, a disproportionately large percentage of the Board of Directors, the Executive Committees, Managing Shareholders, Compensation Committees and Officers have been men.

112.    GT's discriminatory policies, practices and procedures include: (a) assigning female shareholders to lower shareholder levels and then maintaining them at those lower levels despite exemplary performance and results; (b) allowing and encouraging individual shareholders to use their connections and relationships to share origination credits with one another, including but not limited to refusing to include female shareholders in opportunities to earn and share in origination credits; (c) allowing and encouraging individual shareholders to use

22

their connections and relationships to refer billable work to one another, including but not limited to refusing to include female shareholders in opportunities to receive these internal billable work referrals; (d) allocating Firm resources, including staff, in ways that handicap female shareholders; (e) determining compensation in ways that pass forward discrimination in timekeeper and origination revenues and that otherwise fail to take into account actual shareholder performance and contributions; (f) subjecting female shareholders to adverse treatment and denying them opportunities to advance their careers in the Firm; (g) relying on gender-discriminatory criteria, policies and practices in promotion and compensation decisions; (h) refusing or failing to provide equal employment opportunities to female shareholders; (i) ignoring, disregarding, minimizing, covering-up, mishandling or otherwise failing to properly respond to evidence of gender discrimination in the workplace; (j) favoring female employees who are openly flirtatious and/or engage in sexual relationships with highly placed male shareholders; and (k) relying on procedures and criteria that permit and encourage the incorporation of gender stereotypes and bias by GT's male management, including the CEO, management and compensation committees, in making hiring, promotion and compensation decisions.

113.    In general, the policies, practices and procedures that govern the management of shareholders at the Firm lack the sufficient standards, quality controls, implementation metrics, transparency and oversight to ensure equal opportunity at GT.

114.    GT's uniform nationwide policies, practices and procedures result in lower compensation for female shareholders than similarly situated male shareholders and a disproportionate number of female shareholders being assigned to and maintained at the lowest shareholder level.

115. Female shareholders are subjected to continuing unlawful disparate treatment. Moreover, the policies and procedures, while facially neutral, have an ongoing disparate impact on female shareholders.

116. Because GT's management does not provide sufficient oversight or safety measures to protect against intentional and overt discrimination or the disparate impact of facially neutral policies and procedures, female shareholders suffering from discrimination are without recourse. Where complaint and compliance policies exist, they lack meaningful controls, standards, implementation metrics and means of redress such that upper management may ignore, disregard, minimize, cover up, mishandle or otherwise fail to properly respond to evidence of discrimination in the workplace.

117. There is no meaningful separation between complaint reporting channels and the Firm management that creates discriminatory working conditions for women, such that complaints do not remain confidential and victims of discrimination often face retaliation or are dissuaded from raising concerns altogether. The absence of a check on discrimination extends to retaliatory actions, leaving victims of discrimination further vulnerable.

118. GT thus condones, fosters and encourages discrimination. In fact, the Firm's in-house counsel responsible for ensuring the Firm complies with laws against discrimination and retaliation instead exacerbates the discrimination and retaliation by failing to investigate claims and threatening women who raise these issues. Amid and as a result of this environment, female shareholders who question these norms or raise concerns are pushed out of the Firm or terminated.

119. GT demonstrates a reckless disregard—a deliberate indifference—to its female shareholders by overlooking or otherwise dismissing even blatant evidence of gender

discrimination.

120. Such policies, practices and procedures are not valid, job-related or justified by business necessity. Alternative, objective and more valid procedures are available to GT that would avoid such a disparate impact on female shareholders. GT has failed or refused to use such alternative procedures.

121. Upon information and belief, the discriminatory employment policies, practices and procedures to which Class Representative Griesing and Class she seeks to represent are subject are centrally established and implemented at GT's corporate level in New York. CEO Rosenbaum, who works in New York, made the relevant decisions regarding Class Representative Griesing from New York. Additionally, he has the sole authority and discretion to determine assignment and compensation of all shareholders.

122. The facts herein demonstrate that it is GT's standard operating procedure to discriminate against female shareholders. These employment policies, practices and procedures are not unique or limited to any office or practice group; rather, they apply uniformly and systematically to GT shareholders throughout the country, occurring as a pattern and practice throughout all office locations and practice groups.

123. Because of GT's systemic pattern and practice of gender discrimination, the Class Representative and members of the proposed Class have suffered harm including lost compensation, back pay, employment benefits and physical and emotional pain and suffering.

124. GT has failed to impose adequate discipline for management that violates the Firm's fair employment policies and equal opportunity laws and has failed to create adequate incentives for management to comply with such policies and laws.

125. The Class Representative and members of the Class have no plain, adequate or

complete remedy at law to redress the rampant and pervasive wrongs alleged herein, and this suit is their only means of securing adequate relief. The Class Representative and members of the Class have suffered and are now suffering irreparable injury from GT's ongoing, unlawful policies, practices and procedures set forth herein, and they will continue to suffer unless those policies, practices and procedures are enjoined by this Court.

### A. CLASS DEFINITION

126. The proposed Rule 23 Class consists of all female shareholders who are, have been or will be employed by GT in the United States from April 2007 until the date of judgment. Upon information and belief, there are more than two hundred shareholders in the proposed Class.

127. The Class Representative is a member of the Class she seeks to represent.

128. The systemic gender discrimination described in this Complaint has been, and is, continuing in nature.

129. Plaintiff reserves the right to amend the class definition based on discovery or legal developments.

### B. EFFICIENCY OF CLASS PROSECUTION OF CLASS CLAIMS

130. Certification of a nationwide class of female shareholders similarly situated to the Class Representative is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Class Representative and the proposed Class.

131. The individual claims of the Class Representative require resolution of the common questions of whether GT has engaged in a systemic pattern and practice of gender discrimination against female shareholders. The Class Representative seeks remedies to eliminate the adverse effects of such discrimination in her own life and career, to eliminate the

adverse effects of gender discrimination in the lives and working conditions of the proposed Class members and to prevent GT's continued gender discrimination in the future.

132. The Class Representative has standing to seek such relief because of the adverse effect that such discrimination has on her individually and on female shareholders generally. GT caused Ms. Griesing's injuries through its discriminatory practices, policies and procedures and through the disparate impact its policies, practices and procedures have on female shareholders. These injuries are redressable through systemic relief, such as injunction, and other appropriate class-wide and individual remedies sought in this action. In addition, proper relief for Ms. Griesing's individual termination and constructive discharge claims can include reinstatement. As such, she has a personal interest in the policies, practices and procedures implemented at GT.

133. To obtain relief for herself and the Class members, the Class Representative will first establish the existence of systemic gender discrimination as the premise for the relief she seeks. Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

134. The Class Representative's individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

135. Certification of the proposed Class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions for the Class Representative, the Class members and GT.

## C. NUMEROSITY AND IMPRACTICABILITY OF JOINDER

136. The Title VII Class that the Class Representative seeks to represent is so numerous that joinder of all members is impracticable. Upon information and belief, the members of the proposed Class currently number approximately 215.

## D. COMMON QUESTIONS OF LAW AND FACT

137. The prosecution of the claims of the Class Representative will require the adjudication of numerous questions of law and fact common to their individual claims and those of the Class they seek to represent.

138. The common questions of law include, *inter alia*: (a) whether GT has engaged in a pattern and practice of unlawful, systemic gender discrimination in its assignment, compensation, selection, promotion, advancement, personnel management, training and discipline policies, practices and procedures, and in the general terms and conditions of work and employment; (b) whether the failure to institute adequate standards, quality controls, implementation metrics or oversight in assignment, development, compensation, promotion, training, evaluation, personnel management, termination and complaint policies, practices and procedures violates Title VII and/or other statutes; (c) whether the lack of transparency and of opportunities for redress in those systems violates Title VII and/or other statutes; (d) whether the failure of upper management and HR to prevent, investigate or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and/or other statutes; (e) whether GT is liable for a continuing systemic violation of Title VII, and/or other statutes; and (f) a determination of the proper standards for proving a pattern or practice of discrimination by GT against its female employees under both a disparate treatment and disparate impact theory of liability.

139.	The common issues of law include, *inter alia*: (a) the proper standards for proving a pattern and practice of discrimination by GT against its female shareholders under both a disparate treatment and disparate impact theory of liability; (b) whether GT has engaged in unlawful, systemic gender discrimination through its hiring, assignment, compensation, origination calculation, resource allocation, timekeeper revenue calculation, client pitch participation, development, promotion and compensation policies, practices and procedures; (c) whether GT's failure to institute adequate standards, quality controls, implementation metrics or oversight of those policies, practices and procedures violates Title VII and/or other statutes; (d) whether the lack of transparency and of opportunities for redress in those systems violates Title VII and/or other statutes; (e) whether GT's failure to prevent, investigate or properly respond to evidence and complaints of discrimination in the workplace violates Title VII and other statutes; and (f) whether GT is liable for continuing systemic violation of Title VII and/or other statutes.

140.	The common questions of fact include, *inter alia*: whether GT has: (a) used a system of assigning shareholders to shareholder levels that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (b) through the use of that system of assignment placed female shareholders in lower shareholder levels than similarly situated male shareholders; (c) systematically, intentionally or knowingly placed female shareholders in shareholder levels lower than similarly situated male shareholders; (d) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (e) through the use of that compensation system compensated female shareholders less than similarly situated males in salary, bonuses and/or other perks; (f) systematically, intentionally or knowingly compensated female shareholders less than similarly situated male shareholders; (g) used a system of

allocating origination credit and that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (h) through the use of that system of allocating origination credit failed to allocate origination credit to female shareholders in a commensurate manner to their similarly situated male counterparts; (i) systematically, intentionally or knowingly failed to allocate origination credit to female shareholders in a commensurate manner to their similarly situated male counterparts; (j) used a system of allocating casework that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (k) through the use of that system of allocating casework failed to allocate casework to female shareholders in a commensurate manner to their similarly situated male counterparts; (l) systematically, intentionally or knowingly failed to allocate casework to female shareholders in a commensurate manner to their similarly situated male counterparts; (m) used a system of allocating opportunities to participate in client pitches that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (n) through the use of that system of allocating opportunities to participate in client pitches, failed to allocate casework to female shareholders in a commensurate manner to their similarly situated male counterparts; (o) systematically, intentionally or knowingly failed to allocate opportunities to participate in client pitches to female shareholders in a commensurate manner to their similarly situated male counterparts; (p) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency and opportunities for redress; (q) through the use of that promotion system precluded or delayed the promotion of female shareholders into higher jobs traditionally held by male shareholders; (r) systematically, intentionally or knowingly precluded or delayed the selection and promotion of female shareholders into higher level jobs

traditionally held by male shareholders; (s) used a system for performance evaluations which lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress; (t) through the use of that performance evaluation system inaccurately, unfairly or disparately measured, classified and compared female and male shareholder performance; (u) systematically, intentionally or knowingly subjected female shareholders to inaccurate, unfair or discriminatorily critical or lowered performance evaluations; (v) used complaint investigation systems that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency or opportunities for redress; (w) relying and using these systems, minimized, ignored or covered-up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and response to complaints of discrimination and harassment brought to the attention of senior management; (x) systematically, intentionally, knowingly or deliberately sowed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled or covered up evidence of or complaints of gender discrimination; (y) retaliated against those who have complained of gender-based discrimination through techniques including but not limited to failing to assign them casework, threatening them with lawsuits, intimidating them, demeaning them and ultimately terminating their employment; and (z) otherwise discriminated against women in the terms and conditions of employment.

141. The employment policies, practices and procedures to which the Class Representative and the Class members are subjected were and are set by Firm management and apply universally to all Class members nationwide. These employment policies, practices and procedures are not unique or limited to any office or practice group; rather they apply to all offices and practice groups and, thus, affect the Class Representative and Class members in the

same ways regardless of the office location or practice group in which they work. Discrimination in selection, promotion and advancement occurs as a pattern and practice throughout all GT offices and practice groups.

### E.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

142.    The Class Representative's claims are typical of the claims of the proposed Class. The Class Representative asserts claims in each of the categories of claims she asserts on behalf of the proposed Class.

143.    Like members of the proposed Class, the Class Representative is a female shareholder who was an employee of GT during the liability period.

144.    Differential treatment between male and female shareholders occurs as a pattern and practice throughout all levels and offices of GT.  GT's predominately male managers discriminate against female shareholders in hiring, compensation, matters affecting female shareholders' timekeeper and origination credits and assigning and distributing work and client pitches. This differential treatment has affected the Class Representative and the Class members in the same or similar ways.

145.    GT has failed to respond adequately or appropriately to evidence and complaints of discrimination.  GT's investigations into complaints of gender discrimination have been inadequate and superficial.  The Class Representative and Class members have been affected in the same or similar ways by GT's failure to implement adequate procedures to detect, monitor and correct this pattern and practice of discrimination.

146.    GT has failed to create adequate incentives for its managing shareholders to comply with equal employment opportunity laws regarding each of the employment policies, practices and procedures referenced in this Complaint, and the Firm has failed to discipline

adequately its managers and other employees when they violate antidiscrimination laws. These failures have affected the Class Representative and the Class members in the same or similar ways.

147. The relief necessary to remedy the claims of the Class Representative is the same as that necessary to remedy the claims of the proposed Class members.

148. The Class Representative seeks the following relief for her individual claims and for the claims of the members of the proposed Class: (a) a declaratory judgment that GT has engaged in systemic gender discrimination against female shareholders by (i) paying female shareholders less than their male counterparts, (ii) hindering female shareholders from receiving origination credits, (iii) hindering female shareholders from generating timekeeper revenue, (iv) assigning female shareholders to lower shareholder levels, (v) maintaining female shareholders in lower shareholder levels, (vi) failing to investigate or respond to evidence of discrimination and harassment in the workplace against female shareholders and (vii) otherwise exposing female shareholders to differential treatment; (b) a permanent injunction against such continuing discriminatory conduct; (c) injunctive relief that effects a restructuring of GT's policies, practices and procedures for hiring, assigning shareholder levels, compensation, assigning and allocating timekeeper revenues, origination credits, billable work and client pitches so female shareholders can compete fairly in the future for clients and assignments, leading to higher compensation traditionally enjoyed by male shareholders; (d) equitable relief that effects a restructuring of the GT workforce so female shareholders are advanced into the higher shareholder levels that they would have held in the absence of GT's gender discrimination; (e) back pay, front pay, reinstatement and other equitable remedies necessary to make female employees whole from GT's past discrimination; (f) compensatory damages; (g) punitive and

nominal damages to deter GT from engaging in similar discriminatory practices in the future; and (h) attorneys' fees, costs and expenses.

## F.    ADEQUACY OF REPRESENTATION

149.    The Class Representative's interests are coextensive with those of the members of the proposed Class.  The Class Representative seeks to remedy GT's discriminatory policies, practices and procedures so female shareholders will not receive disparate pay and differential treatment.

150.    The Class Representative is willing and able to represent the proposed Class fairly and vigorously as she pursues her similar individual claims in this action.

151.    The Class Representative has retained counsel sufficiently qualified, experienced and able to conduct this litigation and to meet the time and fiscal demands required to litigate an employment discrimination class action of this size and complexity.  The combined interests, experience and resources of the Class Representative and her counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

## G.    REQUIREMENTS OF RULE 23(B)(2)

152.    GT has acted or refused to act on grounds generally applicable to the Class Representative and the proposed Class.

153.    GT has acted on grounds generally applicable to the Class Representative and the proposed Class by adopting and following systemic policies, practices and procedures that are discriminatory on the basis of gender.  Gender discrimination is GT's standard operating procedure rather than a sporadic occurrence.

154. GT has also acted or refused to act on grounds generally applicable to the Class Representative and the proposed Class by, *inter alia*: (a) assigning female shareholders to lower shareholder levels; (b) failing to assign and allocate billable work and client pitches to female shareholders; (c) denying female shareholders origination credits they should have received; (d) denying female shareholders opportunities to generate timekeeper revenues; (e) calculating and allocating origination and timekeeper revenues in a manner discriminatory to female shareholders; (f) failing to promote female shareholder and maintaining them at lower shareholder levels; (g) denying female shareholders opportunities to participate in client pitches; (h) denying female shareholders the same bonuses and other benefits provided to similarly situated male shareholders; (i) failing to pay female shareholders on par with similarly situated male shareholders; (j) permitting shareholders to claim duplicative credit for the same originations; (k) directing work to male shareholders at the expense of female shareholders; (l) refusing to adopt and apply selection, compensation, Human Resources and management policies, practices and procedures that do not have a disparate impact on, or otherwise systemically discriminate against female shareholders; (m) failing to prevent, respond to, adequately investigate and resolve claims of gender discrimination; and (n) refusing to provide equal terms and conditions of employment for female shareholders.

155. GT's policies, practices and procedures of assignment, development, advancement, evaluation and compensation have resulted in gender discrimination and stratification. The systemic means of accomplishing such gender-based stratification include, but are not limited to, GT's policies, practices and procedures for: assigning work; attributing and calculating origination credit; attributing and calculating timekeeper revenue; allowing individual shareholders to share origination credit and billable work; hiring; assigning of

shareholder level; promoting; developing; advancing; and compensating shareholders. These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; and opportunities for redress or challenge. As a result, shareholders are assigned work, evaluated, compensated, developed and promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly manage or reward shareholders.

156. GT's systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class as a whole.

157. Injunctive, declaratory and affirmative relief are the predominant relief sought in this case. Entitlement to declaratory, injunctive and affirmative relief flows directly and automatically from proof of GT's systemic gender discrimination. In turn, entitlement to declaratory, injunctive and affirmative relief forms the factual and legal predicate for recovery by the Class Representative and Class members of monetary and nonmonetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of nominal and punitive damages.

## H.    REQUIREMENTS OF RULE 23(B)(3)

158. The common issues of fact and law affecting the claims of the Class Representative and proposed Class members—including, but not limited to, the common issues identified in Section V.D above—predominate over any issues affecting only individual claims. The common issues include whether GT has engaged in gender discrimination against female shareholders by (a) paying female shareholders less than their male counterparts, (b) denying female shareholders promotion and advancement opportunities in favor of male shareholders and

(c) failing to prevent, respond to, investigate adequately and resolve appropriately instances of gender discrimination.

159. A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Class Representative and members of the proposed Class. The cost of proving GT's pattern and practice of discrimination makes it impracticable for the Class Representative and members of the proposed Class to pursue their claims individually.

160. By virtue of the pattern and practice of discrimination at GT, the Class Representative and Class members are eligible for monetary remedies for losses caused by the systemic discrimination, including backpay, frontpay, reinstatement, compensatory damages and other nominal and punitive damages.

161. This action may be certified as a class pursuant to Rule 23(c)(4) because the Class issues apply to all class members and to all GT locations and practice groups nationwide. Additionally, GT policy provides that the Chief Executive Officer has the sole authority and discretion to determine the compensation of all shareholders nationwide.

162. Class Representative alternatively seeks to maintain this action as a class pursuant to 23(c)(4), seeking partial certification of the common questions of law and fact.

## VI.    COLLECTIVE ALLEGATIONS UNDER THE EQUAL PAY ACT

163. Ms. Griesing incorporates by reference allegations from previous paragraphs of the Complaint alleging class-based discrimination against female shareholders.

164. Ms. Griesing brings collective claims under the Equal Pay Act pursuant to Section 16(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), on behalf of all members of the EPA Collective Action Class, which consists of: all current, former and future female shareholders of GT during the applicable liability period, including until the date of judgment,

who (a) were not compensated equally to similarly situated male shareholders, (b) were not compensated equally to male shareholders who performed substantially similar work, (c) were denied equal compensation to similarly situated male shareholders by being hired into lower shareholder levels than male shareholders who performed substantially similar work, (d) were denied promotion and advancement opportunities that would result in greater compensation in favor of less-qualified male shareholders, (e) were denied origination credits that would result in greater compensation in favor of less-qualified male shareholders, (f) were not assigned billable work that would result in greater timekeeper revenue and thus greater compensation in favor of less-qualified male shareholders or (g) were denied opportunities to participate in client pitches that would result in original credits and therefore greater compensation in favor of less-qualified male shareholders.

165. Questions of law and fact common to the EPA Collective Action Plaintiffs as a whole include but are not limited to the following:

(a) Whether Defendant unlawfully failed and continues to fail to compensate female shareholders at a level commensurate with similarly situated male shareholders;

(b) Whether Defendant unlawfully assigned and maintained and continues to assign and maintain female shareholders into lower shareholder levels, thus affecting their compensation, than similarly qualified male shareholders;

(c) Whether Defendant's policy and practice of failing to compensate female employees on a par with comparable male shareholders as a result of (a) and (b) violates applicable provisions of the EPA; and

(d)     Whether Defendant's failure to compensate female shareholders on a par with comparable male employees as a result of (a), (b) and (c) was willful within the meaning of the EPA.

166.     Counts for violations of the EPA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the EPA Collective Action Plaintiffs who opt-in to this action because the claims of the Plaintiff are similar to the claims of the EPA Collective Action Class.

167.     Plaintiff Griesing and the EPA Collective Action Plaintiffs (a) are similarly situated; (b) have substantially similar job classifications, functions, titles and duties; and (c) are subject to Defendant's common policy and practice of gender discrimination in (i) failing to compensate female shareholders on par with male shareholders who perform substantially equal work; (ii) failing to assign female shareholders to shareholder levels assigned to similarly situated male shareholders; (iii) hiring and assigning female shareholders into lower-level positions than similarly situated male shareholders; (iv) allowing and encouraging shareholders to share billable work, client pitches and origination credit thus decreasing female shareholders' timekeeper revenue and resulting in lower compensation than male shareholders; and (v) failing to provide female shareholders equal pay by denying them opportunities for promotion and advancement comparable to those afforded to male shareholders who perform substantially equal work.

VII.   **COUNTS**

## CLASS AND COLLECTIVE ACTION COUNTS

### CLASS COUNT I

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"),**

**42 U.S.C. § 2000e, *et seq,***

**ASSIGNMENT DISCRIMINATION**

**(On behalf of Class Representative Griesing and all Class members)**

168.   Class Representative Griesing re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

169.   Defendant has discriminated against the Class Representative and all members of the Class in violation of Title VII because of or on the basis of their gender.

170.   Defendant has discriminated against the Class Representative and all members of the Class by treating them differently from and less preferably than similarly situated male shareholders and by subjecting them to discriminatory assignment practices by assigning them into lower shareholder levels than similarly situated male attorneys and in violation of Title VII.

171.   GT's policies, practices or procedures have produced a disparate impact against the Class Representative and the Class members with respect to their hiring.

172.   GT's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representative and the members of the proposed Class, entitling the Class Representative and the members of the Class to punitive damages.

173.   By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Class Representative and members of the Class,

Class Representative and members of the Class are entitled to the application of the continuing violations doctrine to all violations alleged herein.

174. As a direct and proximate result of Defendant's conduct alleged in this Complaint, the Class Representative and the members of the Class have suffered and continue to suffer harm, including but not limited to: lost back pay and front pay, lost bonuses, lost benefits, lost interest and attorneys' fees and costs. Class Representative Griesing is entitled to recover such monetary and other damages, punitive damages, interest and attorneys' fees and costs from Defendant under Title VII.

175. As a further direct and proximate result of Defendant's unlawful conduct, the Class Representative and the members of the Class have suffered and continue to suffer, among other items, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress and mental anguish. Class Representative and Class members are entitled to recover damages for such injuries from Defendant under Title VII.

176. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**CLASS COUNT II**

**VIOLATION OF TITLE VII,**

**42 U.S.C. § 2000e, *et seq.***

**PAY DISCRIMINATION**

**(On behalf of Class Representative Griesing and all Class members)**

177. Class Representative Griesing re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

178. This Count is brought on behalf of the Class Representative and all members of the Class.

179. Defendant, an employer of Class Representative and Class members within the

meaning of Title VII, has discriminated against the Class Representative and the Class by treating them differently from, and less preferably than, similarly situated males by subjecting them to: discriminatory pay; discriminatory denials of origination credit, timekeeper revenues, client pitches and billable work; and other differential treatment on the basis of their gender affecting their compensation, in violation of Title VII.

180. Defendant's policies, practices and procedures have produced a disparate impact on the Class Representative and the Class with respect to their terms and conditions of employment.

181. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of the Class Representative and the Class, entitling the Class Representative and the members of the Class to punitive damages.

182. By reason of the continuous nature of Defendant's discriminatory conduct regarding compensation, which persisted throughout the employment of the Class Representative and the Class, the Class Representative and the Class are entitled to application of the continuing violations doctrine to all violations alleged herein.

183. As a result of Defendant's conduct alleged in this Complaint, the Class Representative and the Class have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, including interest.

184. By reason of Defendant's discrimination, the Class Representative and the Class are entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

185. As a further result of Defendant's unlawful conduct, the Class Representative and the members of the Class have suffered and continue to suffer, *inter alia*, impairment to their

name and reputation, humiliation, embarrassment, emotional and physical distress and mental anguish. Plaintiffs are entitled to recover damages for such injuries from Defendant under Title VII.

186. Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COLLECTIVE ACTION COUNT III

### VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED BY THE EQUAL PAY ACT OF 1963,

### 29 U.S.C. §§ 206, *ET SEQ.*

### (On Behalf of the Plaintiff and EPA Collective Action Plaintiffs)

187. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

188. This Count is brought on behalf of the Plaintiff and all EPA Collective Action Class, including all EPA Collective Action Plaintiffs who "opt in" to this action.

189. Defendant has discriminated against the Plaintiff and all EPA Collective Action Plaintiffs within the meaning of the Equal Pay Act of 1963 in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.*, as amended by the EPA, by providing them with lower pay than similarly situated male colleagues on the basis of their gender, female, even though Plaintiff and all others similarly situated performed similar duties requiring the same skill, effort and responsibility as their male counterparts.

190. Plaintiff, all EPA Collective Action Plaintiffs, and similarly situated male shareholders all perform similar job duties and functions as GT shareholders. Plaintiff, all EPA Collective Action Plaintiffs, and similarly situated male shareholders all performed jobs that required equal skill, effort and responsibility.

191. Defendant discriminated against Plaintiff and all EPA Collective Action Plaintiffs

by subjecting them to discriminatory pay, discriminatory denials of bonuses and other compensation incentives, discriminatory denial of promotions and other forms of discrimination in compensation in violation of the Equal Pay Act.

192. The differential in pay between male and female shareholders was not due to seniority, merit, quantity or quality of production or a factor other than sex, but was due to gender.

193. Defendant caused, attempted to cause, contributed to or caused the continuation of pay discrimination based on gender, in violation of the EPA.

194. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a). Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

195. As a result of Defendant's conduct as alleged in this Complaint, Plaintiff and all EPA Collective Action Plaintiffs have suffered and continue to suffer harm, including but not limited to: lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

196. By reason of Defendant's discrimination, Plaintiff and all EPA Collective Action Plaintiffs are entitled to all legal and equitable remedies available for violations of the EPA, including liquidated damages for all willful violations, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

197. Attorneys' fees should be awarded under 29 U.S.C. §216(b).

# INDIVIDUAL COUNTS

## INDIVIDUAL COUNT IV

### VIOLATION OF TITLE VII,

### 42 U.S.C. § 2000e-5(f), *et seq.*, AS AMENDED

### RETALIATION

#### (On behalf of Plaintiff Griesing)

198.    Ms. Griesing re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

199.    Ms. Griesing engaged in protected activity that included, but is not limited to, complaining to GT about gender discrimination in hiring and compensation at GT.    She complained to members of the Firm on numerous occasions, including but not limited to, Global Operating Shareholder Hilarie Bass; Assistant General Counsel Mary Bruno; Philadelphia Operating Shareholder and Office Litigation Group Chair Robert Goldich; Regional Operating Shareholder Michael Lehr and Current GT CEO Richard Rosenbaum.    She also engaged in protected activity by filing an EEOC Charge alleging gender discrimination on September 21, 2009.

200.    GT terminated Ms. Griesing's employment in retaliation for her discrimination complaints.    GT also retaliated against Ms. Griesing by, *inter alia*: denying her equal access to client work and client origination opportunities; refusing to compensate her in a timely manner; denying her ability to participate in the planning and administration of the Philadelphia office litigation group; interfering with her ability to work with other shareholders on client and Firm matters; interfering with her relationships with her principal associate and administrative assistant; threatening to sue her for defamation; and treating her differently than other shareholders in the annual review and compensation process, all in violation of Title VII.    These

adverse employment actions materially and adversely changed Ms. Griesing's overall terms and conditions of employment.

201. GT's retaliatory acts against Ms. Griesing were a direct and proximate result of her protected activities.

202. A reasonable employee would find GT's retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

203. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard to Ms. Griesing's rights, entitling her to punitive damages.

204. Defendant's actions and failures to act have caused Ms. Griesing to suffer harm, including without limitation lost earnings, lost benefits and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

205. Ms. Griesing is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

206. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## INDIVIDUAL COUNT V

### VIOLATION OF TITLE VII,

### 42 U.S.C. § 2000e-5(f), *et seq.*, AS AMENDED

### WRONGFUL TERMINATION

### (On behalf of Plaintiff Griesing)

207. Ms. Griesing re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

208. GT wrongfully terminated Ms. Griesing's employment due to gender discrimination and in retaliation for her discrimination complaints. GT's wrongful termination

was an adverse employment action that materially and adversely changed Ms. Griesing's overall terms and conditions of her employment in violation of Title VII.

209.    GT's wrongful termination of Ms. Griesing was a direct, proximate and pretextual result of gender discrimination and her protected activities.

210.    A reasonable employee would find GT's wrongful termination of Ms. Griesing materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

211.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard to Ms. Griesing's rights, entitling her to punitive damages.

212.    GT's wrongful termination of Ms. Griesing has caused her to suffer harm, including without limitation lost earnings, lost benefits and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

213.    Ms. Griesing is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

214.    Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## INDIVIDUAL COUNT VI

### VIOLATION OF TITLE VII,

### 42 U.S.C. § 2000e-5(f), *et seq.*, AS AMENDED

### CONSTRUCTIVE DISCHARGE

### (On behalf of Plaintiff Griesing)

215.    Ms. Griesing re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

216.    GT constructively discharged Ms. Griesing's employment due to gender discrimination and in retaliation for her discrimination complaints. GT's constructive discharge

of Ms. Griesing was an adverse employment action that materially and adversely changed Ms. Griesing's overall terms and conditions of her employment in violation of Title VII.

217. GT intentionally created an intolerable work atmosphere that forced Ms. Griesing to end her employment, and working conditions were so difficult and unpleasant that a reasonable person in Ms. Griesing's position would have felt compelled to resign.

218. GT's constructive discharge of Ms. Griesing was a direct, proximate and pretextual result of gender discrimination and her protected activities.

219. A reasonable employee would find GT's constructive discharge of Ms. Griesing materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

220. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard to Ms. Griesing's rights, entitling her to punitive damages.

221. GT's constructive discharge of Ms. Griesing has caused her to suffer harm, including without limitation lost earnings, lost benefits and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

222. Ms. Griesing is therefore entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

223. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## CLASS, COLLECTIVE AND INDIVIDUAL COUNT I

## DECLARATORY JUDGMENT

### 28 U.S.C.A. §§ 2201-2202

**(On behalf of Plaintiff Griesing, the Class and EPA Collective Action Plaintiffs)**

224. Ms. Griesing re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

225. Ms. Griesing filed her original Complaint in this Court on December 3, 2012.

226. On the same day, GT filed in the United States District Court for the Eastern District of Pennsylvania a Petition To Compel Arbitration of the allegations set forth in Ms. Griesing's Complaint.

227. Ms. Griesing disputes that any of her claims, including those alleged on behalf of the Class and the EPA Collective Action Plaintiffs, must be arbitrated.

228. Accordingly, Ms. Griesing seeks declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, because an actual and justiciable controversy has arisen and now exists between Ms. Griesing and GT as to whether any of her claims must be resolved by arbitration rather than by a jury in this Court. A judicial declaration is necessary and appropriate at this time to determine the respective rights and obligations of the Parties with respect to arbitration of Ms. Griesing's claims.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Class Representative Griesing, on behalf of herself and the members of the Class she seeks to represent, requests the following relief:

A. Certification of this case as a class action maintainable under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3), or alternatively, under (c)(4), on behalf of the proposed Plaintiff Class; designation of the proposed Class Representative as representative of

this Class; and designation of Plaintiff's counsel of record as Class Counsel;

B. Designation of this action as a collective action on behalf of the proposed EPA Collective Plaintiff (asserting EPA claims) and

(i) promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Opt-In Class, which (a) apprises them of the pendency of this action and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

(ii) tolling the statute of limitations on the claims of all members of the FLSA Opt-In Class from the date the original Complaint was filed until the Class members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

C. Designation of Plaintiff Griesing as representative of the EPA Collective Action;

D. Declaratory judgment that GT's employment policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Class Representative and Class members under Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act;

E. A permanent injunction against GT and its shareholders, partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, usages and gender discrimination as set forth herein, and order such injunctive relief as will prevent Defendant from continuing its discriminatory practices and protect others similarly situated;

F. An Order requiring GT to initiate and implement programs that (i) will provide equal employment opportunities for female employees; (ii) will remedy the effects of the Defendant's past and present unlawful employment policies, practices and/or procedures; and

(iii) will eliminate the continuing effects of the discriminatory and retaliatory practices described above;

G.     An Order requiring GT to initiate and implement systems of assigning, training, transferring, compensating and promoting female employees in a non-discriminatory manner;

H.     An Order establishing a task force on equality and fairness to determine the effectiveness of the programs described in (F) through (G) above, which would provide for (i) monitoring, reporting and retaining of jurisdiction to ensure equal employment opportunity, (ii) the assurance that injunctive relief is properly implemented, and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in (F) through (G) above;

I.     An Order placing or restoring the Class Representative and the Class into those jobs they would now be occupying but for GT's discriminatory policies, practices and/or procedures;

J.     An Order directing GT to adjust the compensation for Class Representative Griesing and the Class members to the level that they would be enjoying but for the Defendant's discriminatory policies, practices and/or procedures;

K.     An award of back pay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits suffered by the Class Representative and the Class, to be determined at trial;

L.     Any other appropriate equitable relief to which the Class Representative and the Class members are entitled;

M.     An award of compensatory damages in an amount not less than 50 million dollars;

N.     An award of backpay and frontpay in an amount not less than 50 million dollars;

O.     An award of punitive damages in an amount not less than 100 million dollars;

P.     An award of litigation costs and expenses, including reasonable attorneys' fees, to the Class Representative and the Class;

Q.     Declaratory Judgment that all of Ms. Griesing's claims, either individually or on behalf of the Class or the EPA Collective Action Plaintiffs, may be decided by a jury rather than through arbitration;

R.     Pre-judgment interest;

S.     Such other and further relief as the Court may deem just and proper; and

T.     Retention of jurisdiction by the Court until such time as the Court is satisfied that the Defendant has remedied the practices, policies and/or procedures complained of herein and has determined that the Defendant's practices, policies and procedures are in full compliance with the law.

## IX.     **DEMAND FOR JURY**

The Plaintiff demands trial by jury of all issues triable of right to a jury.

Respectfully submitted,

Jeremy Heisler (JH-0145)
SANFORD HEISLER, LLP
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5656
Facsimile: (646) 402-5650

**David W. Sanford** (DC Bar No. 457933)
**Katherine M. Kimpel** (DC Bar No. 493028)
**Kate Mueting** (DC Bar No. 988177)
SANFORD HEISLER, LLP
1666 Connecticut Ave, N.W.
Suite 300

Washington, D.C. 20009
Telephone: (202) 499-5200
Facsimile: (202) 742-7776

**Janette Wipper** (CA Bar No. 275264)
**SANFORD HEISLER, LLP**
555 Montgomery Street, Suite 1206
San Francisco, CA 94111
Telephone: (415) 795-2025
Facsimile:  (415) 795-2024

**Jill M. Sullivan** (CA Bar No. 185757)
**OF COUNSEL**
**SANFORD HEISLER, LLP**
4845 Fairport Way
San Diego, CA 92130
Telephone: (619) 398-7406
Facsimile: (202) 499-5199

*Counsel for Plaintiff and the Class*